**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF MISSOURI**
**EASTERN DIVISION**

| | |
|---|---|
| **ESADA COHADAREVIC,** ) | |
| ) | |
| **Plaintiff,** ) | |
| ) | |
| **vs.** ) | **Case number 4:12cv1835 TCM** |
| ) | |
| **CAROLYN W. COLVIN, Acting** ) | |
| **Commissioner of Social Security,** ) | |
| ) | |
| **Defendant.** ) | |

## MEMORANDUM AND ORDER

This 42 U.S.C. § 405(g) action for judicial review of the final decision of Carolyn W. Colvin, the Acting Commissioner of Social Security (Commissioner), denying the applications of Esada Cohadarevic for disability insurance benefits (DIB) under Title II of the Social Security Act (the Act), 42 U.S.C. § 401-433, and for supplemental security income (SSI) under Title XVI of the Act, 42 U.S.C. § 1381-1383b, is before the undersigned for a final disposition pursuant to the written consent of the parties. See 28 U.S.C. § 636(c).

### Procedural History

Ms. Cohadarevic applied for DIB and SSI in March 2010, alleging a disability as of April 1, 2003, caused by a L5-S1 large disc herniation, sciatica, pressure on the nerve, depression, and a right arm injury. (R.[1] at 117-26, 156.) Her applications were denied initially and after a hearing in June 2011 before Administrative Law Judge (ALJ) Jhane

---

[1]References to "R." are to the administrative record filed by the Commissioner with her answer.

Pappenfus.  (Id. at 9-34, 38-52, 57-61, 156.)  The Appeals Council then denied her request for review, thereby adopting the ALJ's decision as the final decision of the Commissioner.  (Id. at 1-3.)

### Testimony Before the ALJ

Plaintiff, represented by counsel, and Gerald D. Belchick, Ph.D., a vocational expert, testified at the hearing.  Shortly after the testimony began, Plaintiff's counsel stated that he had a translator present for Plaintiff.[2]  (Id. at 12.)  After noting that two records reported that Plaintiff spoke fluent English and another record indicated she no longer needed a translator, the ALJ stated that the interpreter was not needed.  (Id. at 12-13.)

Plaintiff testified that she was then thirty-seven years old.  (Id. at 13.)  She is married and has two children under the age of eighteen.  (Id. at 16.)  She immigrated from Bosnia in 1998.  (Id.)  Her husband is a truck driver and is sometimes gone for an extended period of time.  (Id. at 33.)

Asked about her past jobs, Plaintiff explained that she worked "a heavy duty job," "like cleaning big machines."  (Id. at 13-14.)  Asked if she did packaging, Plaintiff replied, "I work in like a heavy duty, like sanitation."  (Id. at 14.)  Asked what she meant by heavy work, Plaintiff explained, "Me clean heavy, big machine that making food, and it's a big company."  (Id.)  She occasionally lifted twenty pounds on the job.  (Id.)

---

[2]A Bosnian interpreter had been requested by the Social Security Administration for an earlier hearing, but the hearing was then postponed.  (Id. at 218.)

Asked by her attorney about her medical problems, Plaintiff testified she had been told she has a problem with her disc.  (Id. at 17.)  She further stated that her husband could explain better.  (Id.)  She also has "something like mental problem, depression."  (Id.)  Her doctor had mentioned post-traumatic stress disorder (PTSD) related to what she had experienced during the war in Bosnia.  (Id. at 17-18.)  She takes medication for high blood pressure, depression, and panic attacks.  (Id. at 18.)  She also takes medication to help her sleep.  (Id.)  Her illnesses cause her trouble when standing, sitting, and walking.  (Id.)  She cannot sit for longer than an hour.  (Id.)  She often has to change positions.  (Id.)  She cannot walk farther than "[l]ike half mile," and that is if she walks slowly  (Id. at 19-20.)  Her husband helps her get dressed and helps her wash her hair.  (Id. at 18-19.)  She does not do any household chores or cook.  (Id. at 19.)  She does not do the grocery shopping.  (Id.)  She cannot repetitively bend over or stoop, and cannot lift anything.  (Id. at 20.)  Her sleep is affected by her back injury.  (Id. at 21.)  She takes Cymbalta to help her sleep.  (Id.)  Sometimes, she sleeps three hours or more during the day.  (Id.)

Also, Plaintiff is tired.  (Id.)  She cannot be in a room when more than one person is talking.  (Id.)  Because of this difficulty, she has had her husband remove the television from their house.  (Id. at 22.)  Sometimes, she has to leave the room when people come over.  (Id. at 23.)  Her depression causes her memory problems.  (Id. at 22.)

The ALJ asked Plaintiff about a reference in her medical records with Dr. Asher to her refusing therapy and counseling.  (Id. at 24.)  She explained that she was told she had to do "go away therapy" and that she has trouble being in a group.  (Id.)  She stated that she is

getting individual therapy or counseling.  (Id.)  The ALJ also asked Plaintiff how she can describe her hypertension as high when the records describe it as under control.  (Id. at 25.) Plaintiff replied that it can be high if she is angry.  (Id. at 26.)

Asked by the ALJ to describe Plaintiff's past work, Dr. Belchick described her work as a dishwasher at a restaurant as unskilled and with a specific vocational preparation level of two and an exertional level of light.  (Id. at 27.)  Her jobs in assembly work, production line, factory work, and housekeeping were at the same levels.  (Id. at 28.)  None had any transferable skills.  (Id.)  Asked if Plaintiff could perform her past relevant work if she was limited to unskilled, light exertional work requiring only occasional stooping, crouching, and crawling, Dr. Belchick replied that she could.  (Id.)

Dr. Belchick further testified that if Plaintiff was limited to unskilled, sedentary work, she could perform bench assembly or bench packaging work.  (Id. at 28-29.)  Work as an unarmed security guard was unskilled and sedentary, but Plaintiff's language skills presented a problem.  (Id. at 29.)

Dr. Belchick was then asked by Plaintiff's attorney if the sedentary jobs he described required at least six hours of sitting during an eight-hour day.  (Id. at 30.)  They did, with the exception of the unarmed security guard.  (Id.)  That position had a sit/stand option.  (Id. at 31.)  If the person frequently found it difficult, because of anxiety and paranoia, to be in a group without becoming agitated, the jobs would be eliminated.  (Id. at 32.)

## Medical and Other Records Before the ALJ

The documentary record before the ALJ included forms completed as part of the application process, documents generated pursuant to Plaintiff's applications, records from health care providers, and assessments of her physical and mental residual functional capacities.

When Plaintiff applied for DIB and SSI, the interviewer noted that Plaintiff did not have trouble reading, understanding, or answering, but did have trouble sitting, standing, and walking.  (Id. at 153.)

Plaintiff disclosed on a Disability Report that she had completed the eighth grade.  (Id. at 157.)  She answered "No" to the questions whether she could speak, read, and understand English or write in English.  (Id. at 155.)

On a Function Report Adult – Third Party, Plaintiff's husband reported that he helps her get dressed and brush her teeth, washes her back and feet, and, sometimes, washes her hair.  (Id. at 168.)  She does not cook.  (Id. at 169.)  She folds the laundry sitting down and dusts the table.  (Id.)  She shops for food and clothing once a week for one hour.  (Id. at 170.)  Her impairments adversely affect her abilities to lift, walk, remember, and concentrate.  (Id. at 172.)  Lifting and walking causes her pain.  (Id.)  She cannot pay attention for long.  (Id.)  With his help, she can follow written and spoken instructions.  (Id.)  She does not get along well with authority figures.

Plaintiff also completed a Function Report, reporting that her son helps her brush her teeth and hair and makes her a sandwich before he goes to school.  (Id. at 187.)  She sits for

one hour before lying down.  (Id.)  She then gets up, walks around the house, and sits down again.  (Id.)  When her children and husband come back, they eat.  (Id.)  Her husband takes the children to school, makes the meals, and washes the clothes and dishes.  (Id. at 188.)  He also tells her when to take her pills and what pills to take.  (Id. at 189.)  Her impairments adversely affect her abilities to lift, walk, remember, and concentrate.  (Id. at 192.)  She cannot walk for longer than ten minutes before having to stop and rest for twenty minutes.  (Id.)  She does not know how well she follows written or spoken instructions.  (Id.)

Plaintiff receives Medicaid.  (Id. at 196.)

Plaintiff's medical records before the ALJ begin with those of her August 2005 visit to Kenneth E. Harris, M.D., at St. Luke's Clinic for a right elbow injury caused when her arm was caught between two conveyor belts.  (Id. at 224-25.)  Also, her right thumb was numb.  (Id. at 224.)  Because of the pain, she had a limited range of motion in the elbow.  (Id.)  Dr. Harris diagnosed a primarily soft tissue injury.  (Id.)  He opined that she would make a full recovery.  (Id. at 225.)  She was placed in a splint for the wrist and a sling for her back.  (Id.)  She was to elevate and ice her elbow whenever possible, started on ibuprofen, and prescribed Vicodin.  (Id.)

On August 11, Plaintiff saw Douglas Stagg, M.D., for her right elbow, hand, and wrist injury.  (Id. at 226-27.)  She reported having difficulty sleeping at night; pain in her right elbow, wrist and thumb; an inability to move her fingers; and difficulty moving her elbow.  (Id. at 226.)  She was diagnosed with persistent right elbow, wrist, and thumb contusions with sprains.  (Id. at 227.)  He encouraged her to start getting out of the sling and took her

out of the splint.  (Id.)  Plaintiff saw Dr. Stagg again four days later, reporting that she was still having a lot of pain and could not move the elbow, wrist, or hand.  (Id. at 228-29.)  Also, her right hand was still numb.  (Id. at 228.)  On examination, Plaintiff could only flex and extend her elbow a few degrees from the 90 degree position in which she held it.  (Id.)  She could not move the hand, fingers, or wrist.  (Id.)  She was continued on the Motrin, Extra Strength Tylenol, and Vicodin.  (Id.)

Plaintiff reported to Dr. Stagg on September 1 that her elbow was better after she had attended seven physical therapy sessions, but her wrist, hand, and fingers were not.  (Id. at 230-32.)  She had been working sorting potatoes with her left hand and was now experiencing neck pain, bilateral shoulder pain, and bilateral pain in her pectoral muscles.  (Id. at 230.)  She had not been able to do housework; her husband was doing that and also taking care of their children.  (Id.)  She appeared to be in mild discomfort.  (Id.)  She had an improved range of motion in her right elbow, but could only move her right wrist a few degrees from a neutral position and could not move her fingers at all.  (Id.)  She had a full passive range of motion in her wrist and hand.  (Id.)  Her prescriptions were renewed.  (Id. at 231.)  She was to continue with physical therapy.  (Id.)

The next medical record is from March 2008 when Plaintiff consulted Sandra G. Zakroff, M.D., with Family Care Health Centers (Family Care) to establish care.  (Id. at 246-47, 252-53.)  She was noted to have multiple complaints, the most important of which was right arm pain.  (Id. at 246.)  She also had chest pain and was nervous.  (Id.)  Her mother sent her medication from Bosnia to relieve the pain.  (Id.)  The pain came when the weather

changed or when it was night. (Id.) She has trouble with her memory. (Id.) She was described as speaking English fluently, "but sometimes totally forgets how to speak or understand." (Id.) She quit her job after she injured her right arm. (Id.) She slept most of the day, and had daily headaches. (Id.) She smoked two packs of cigarettes a day. (Id.) She was tearful, well-groomed, and had good eye contact. (Id. at 247.) Her judgment was fair to poor. (Id.) Dr. Zakroff diagnosed Plaintiff with major depression with paranoid features and prescribed Cymbalta. (Id.)

Nine days later, Plaintiff returned to Dr. Zakroff for complaints of depression, reporting improvement on Cymbalta. (Id. at 245.) She continued, however, not to go out much and stayed in bed until noon. (Id.) She was not sleeping well. (Id.) She was well-groomed, had good eye contact, a flat affect, a nervous appearance, and fair to poor insight and judgment. (Id.) Her diagnosis and prescription were unchanged. (Id.)

On April 15, Plaintiff saw Dr. Zakroff again for depression. (Id. at 244.) She was feeling and sleeping better, and was not going back to bed after children left. (Id.) Instead, she was staying up and doing housework and trying to go for a walk. (Id.) Her current medications included Vistaril to help her sleep. (Id.)

Plaintiff was seen in April 2009 at the emergency room at St. Anthony's Health Center for complaints of lumbar spine and left shoulder pain. (Id. at 234-40.) The pain had begun two months earlier and had recently increased. (Id. at 237.) X-rays of her lumbar spine revealed "[v]ery slight scoliosis," but were otherwise negative. (Id. at 239.) X-rays of her

left shoulder were negative.  (Id. at 240.)  She was diagnosed with a rotator cuff injury, lumbar pain/strain, and hypertension, and was discharged.  (Id. at 238.)

In September, Plaintiff went to the emergency room at Barnes Jewish Hospital (BJH) for complaints of back pain for the past five years that had been tolerable until two days earlier.  (Id. at 260-92.)  She also had pain in her right heel that prevented her from putting any weight on it.  (Id. at 272.)  And, the back pain radiated to her left hip.  (Id. at 276.)  She could move all extremities well, but the range of motion in her back was limited by pain.  (Id. at 271, 277.)  It was noted that her barriers to learning included language.  (Id. at 272.)  Lumbar spine x-rays revealed narrowing of L5-S1 intervertebral disc with mild retrolisthesis.  (Id. at 265-70.)  X-rays of her right foot and of pelvis showed no fractures or dislocations.  (Id.)  Plaintiff's mobility increased with pain medication.  (Id. at 277.)  She was diagnosed with low back pain and nausea.  (Id. at 285.)  The possibility of a magnetic resonance imaging (MRI) to determine whether disc herniation or nerve impingement was the cause of her pain was discussed, but Plaintiff and her husband declined and elected to go home.  (Id.)  Plaintiff was to follow-up with an orthopedist.  (Id.)  On discharge, she was given prescriptions for tramadol, hydrocodone/acetaminophen, cyclobenzaprine, and prednisone.  (Id. at 279-80, 290-91.)

In October, Plaintiff consulted Laurain Hendricks, M.D., at Family Care for back pain.  (Id. at 242-43, 250-51, 255.)  She described the pain as sporadically existing for five years, but continuous for the past three to four months.  (Id. at 242.)  The pain radiated down her legs to heels.  (Id.)  She also had bruising on her left leg down to her heel.  (Id. at 243.)

Her appearance was tired; her mood was unhappy and anxious; her affect was tearful; and her grooming was normal. (Id.) Her balance, gait, stance, and reflexes were also normal. (Id.) She was diagnosed with backache and major depression with paranoid features. (Id.) She was prescribed Flexeril and ibuprofen. (Id.) Dr. Hendricks decided to refer Plaintiff to a orthopedist and noted on the referral sheet that Plaintiff needed a Bosnian interpreter. (Id. at 255.)

In March 2010, Plaintiff was seen by Beverly Field, Ph.D., at the Washington University School of Medicine Division of Pain Management. (Id. at 294-95, 381-82.) Plaintiff was accompanied to the visit by an interpreter. (Id. at 294.) Plaintiff explained she had not had any physical therapy recently because of the lack of insurance. (Id. at 294.) Her current pain medications included tramadol, hydrocodone, and cyclobenzaprine, which were of "very limited benefit." (Id.) Her low back pain was sharp and shooting, and was generally on the left and sometimes on the right. (Id.) The pain was alleviated a little by ice packs and lying down and was aggravated by activity. (Id.) She reported that she spent much of the day in bed. (Id.) She smoked one pack of cigarettes a day. (Id.) On examination, "[p]ain behaviors were present." (Id.) She alternated sitting and standing during the interview and, when sitting, shifted her weight to the side. (Id.) She had good eye contact, a regular rate and rhythm to her speech, a logical and goal-directed thought process, an occasionally tearful affect, and no delusions or hallucinations. (Id. at 295.) She reported that she cried much of the time and did not want to be around people. (Id.) She had little or no interest in things she formerly enjoyed. (Id.) She had been diagnosed with depression

and prescribed Cymbalta.  (Id.)  Dr. Field diagnosed Plaintiff with major depression, recurrent, and rated as having a Global Assessment of Functioning (GAF) of 63.[3]  (Id.)  Dr. Field recommended that her dosage of Cymbalta be increased to help with her mood.  (Id.)

The next month, Plaintiff saw Jacob M. Buchowski, M.D., an orthopedist, for an evaluation of her low back pain and left leg pain following a motor vehicle accident.  (Id. at 299-313, 378-80.)  Plaintiff completed an Adult Spine Supplement, marking that she had back, arm, and leg pain.  (Id. at 307.)  She circled "maybe" for the question whether she would consider surgery to treat her problem.  (Id.)  To relieve her pain, she had tried physical therapy, narcotic medications, and had had two epidural injections.  (Id.)  Her symptoms were about the same.  (Id.)  The pain was aggravated by standing and walking.  (Id. at 310.)  She could not stand in one place or walk for longer than ten minutes without pain.  (Id.)  She could not sit for longer than thirty minutes.  (Id. at 311.)  She spent most of her time in bed. (Id.)  She rated the pain as being a ten on a ten-point scale.  (Id. at 299, 307.)  Approximately 50 to 75 percent was in the low back and the remaining was in the leg radiating down to the foot.  (Id. at 299.)  She also had diffuse neck pain and thoracic back pain, but was not consulting him for these symptoms.  (Id.)  On examination, Plaintiff was alert, oriented, and

---

[3]"According to the *Diagnostic and Statistical Manual of Mental Disorders* 32 (4th Ed. Text Revision 2000) [DSM-IV-TR], the [GAF] is used to report 'the clinician's judgment of the individual's overall level of functioning,'" **Hudson v. Barnhart**, 345 F.3d 661, 663 n.2 (8th Cir. 2003), and consists of a number between zero and 100 to reflect that judgment, **Hurd v. Astrue**, 621 F.3d 734, 737 (8th Cir. 2010).  A GAF score between 61 and 70 indicates "[s]ome mild symptoms (e.g., depressed mood and mild insomnia) OR some difficulty in social, occupational, or school functioning (e.g., occasional truancy, or theft within the household), but generally functioning pretty well, has some meaningful interpersonal relationships." DSM-IV-TR at 34 (emphasis omitted).

in no acute distress.  (Id. at 300.)  She walked with a normal gait, could stand on her toes and

heels, and could stand on each leg independently.  (Id.)  She could squat down and rise back

up, "albeit with some difficulty."  (Id.)  Her lumbar flexibility was decreased on both flexion

and extension.  (Id.)  She had normal motor strength in her lower extremities.  (Id.)  Her

reflexes were normal and symmetric.  (Id.)  "Internal and external rotation of the hips as well

as flexion and extension of the knees [did] not exacerbate her pain."  (Id.)  Dr. Buchowski

reviewed the 2009 MRI results and the contemporaneous x-rays.  (Id.)  The x-rays revealed

mild L5-S1 degenerative disease and lumbar spine hypomobility with flexion and extension.

(Id. at 313.)  He diagnosed Plaintiff with mechanical back pain and left lower extremity

radicular symptoms due to a left paracentral disc herniation at L5-S1 with compression of

the thecal sac and the traversing left S1 nerve root.  (Id. at 300.)  He discussed with Plaintiff

and her husband a left L5-S1 discectomy to help relieve her radicular symptoms.  (Id.)  She

was to consider the option.  (Id.)

In September, Plaintiff was diagnosed by Dr. Zakroff with backache and major

depression with paranoid features.  (Id. at 354-56.)  Her dosage of Cymbalta was increased.

Dr. Zakroff encouraged Plaintiff to get up in the morning, get dressed, and do "one small

activity."  (Id.)  Plaintiff expressed concern about nonstop headaches that were becoming

worse during the past month.  (Id.)  She reported that she felt tired and had little energy.  (Id.

at 355.)  Her ability to concentrate was decreased.  (Id.)  She felt restless and had difficulties

sleeping four to five days a week.  (Id.)  On examination, she had a depressed and anxious

mood and an abnormal, tearful, and agitated affect.  (Id.)  Dr. Zakroff's assessment was of

headache syndromes, depression, memory impairment, and anxiety disorder, not otherwise specified. (Id.)

Plaintiff returned to Dr. Zakroff the next month for a follow-up of her hypertension and for intermittent dyspnea. (Id. at 352-53.) On examination, Plaintiff had a normal heart rate, rhythm, and sounds. (Id. at 353.) She was diagnosed with benign hypertension. (Id.)

In November, Plaintiff consulted Jaron Asher, M.D., reporting that she had been in the Bosnian war when she was in her late teens and her husband's family had been "largely killed." (Id. at 374.) She did not want therapy because talking about it made her feel worse. (Id.) Citalopram had helped make her sleep, appetite, and mood better. (Id.) On examination, her affect was depressed, her insight and judgment were fair, and her thoughts were goal-directed. (Id.) Her speech was translated. (Id.) He diagnosed her with PTSD with prominent depression. (Id.) Her GAF was 49.[4] (Id.) Dr. Asher increased the dosage of citalopram was increased; Abilify was prescribed. (Id.)

Plaintiff saw Dr. Asher again in December. (Id. at 372-73.) Plaintiff reported she was "a little better" since her medications had been changed, but was still very anxious and depressed. (Id. at 372.) On examination, her speech – translated by a male – was soft and monotonic. (Id.) Her eye contact was poor to fair; her affect was depressed; her thoughts were goal-directed; her insight and judgment were fair. (Id.) Her diagnosis and GAF were

_____

[4]A GAF score between 41 and 50 is indicative of "[s]erious symptoms (e.g., suicidal ideation, severe obsessional rituals, frequent shoplifting) OR any serious impairment in social, occupational, or school functioning (e.g., no friends, unable to keep a job)." DSM-IV-TR at 34 (emphasis omitted).

the same.  (Id.)  Her prescription for citalopram was renewed; her prescription for Abilify was increased; a prescription for clonazepam was added.  (Id. at 373.)

When Dr. Asher again saw Plaintiff, in January 2011, he diagnosed her with prolonged PTSD with prominent depression.  (Id. at 370.)  He prescribed clonazepam, Abilify, and citalopram.  (Id.)  Plaintiff reported that the medications helped.  (Id.)  She felt better, but still seemed depressed.  (Id.)  The citalopram dosage was increased.  (Id.)  On examination, she had a less depressed affect, goal-directed thoughts, and fair insight and judgment.  (Id.)  She had no suicidal ideation, "but sometimes wishes she were dead."  (Id.)  Her speech, translated by another woman, was soft.  (Id.)

In February, Plaintiff saw Dr. Zakroff for a follow-up of her depression and hypertension.  (Id. at 346-48.)  Plaintiff reported having chest pain or discomfort that radiated from her left hand to the left-side of her chest.  (Id. at 346.)  The pain had started fifteen to twenty days ago and was aggravated by activity.  (Id.)  Dr. Zakroff noted that Plaintiff smoked two packs of cigarettes a day.  (Id.)  On examination, Plaintiff had a normal heart rate, rhythm, and sounds.  (Id. at 347.)  Dr. Zakroff diagnosed her with chest pain and benign essential hypertension.  (Id. at 348.)  She referred Plaintiff to cardiology and placed her on a diet.  (Id.)

Later that same month, Plaintiff was seen by David Dobmeyer, M.D., at St. Anthony's Medical Center, for left arm pain for the past several months that radiated up her arm and across her chest.  (Id. at 364-68.)  The pain "ha[d] some intermittent relationship to exertion."  (Id. at 367.) Plaintiff smoked approximately one pack of cigarettes a day.  (Id.)  She had

hypertension and high cholesterol, which she described as being under control. (Id.) She was to have a stress echocardiogram. (Id.) The stress echocardiogram was negative for ischemia, but revealed hypertensive blood pressure in response to exercise. (Id. at 359-63.)

On March 7, Plaintiff returned to Dr. Asher. (Id. at 371.) She reported that she was functioning better, was enjoying life more, and was more energetic. (Id.) She wanted to continue on her current medications, but agreed to decrease the dosage of clonazepam after being told it was meant to be a short-term medication. (Id.) Plaintiff reported that "when her depression is better her memory is better, thus she no longer need[ed] a translator." (Id.) On examination, her speech was within normal limits, her eye contact was good, her affect was euthymic, and her thoughts were goal-directed. (Id.) Her diagnosis was unchanged. (Id.) Her GAF was 56.[5] (Id.)

Also before the ALJ were assessments of Plaintiff's mental and physical residual functional capacities.

Devyani Hunt, M.D., wrote "To Whom It May Concern" in February 2010. (Id. at 254, 383.) After outlining Plaintiff's complaint of back problems since 2002 and the December 2009 MRI results, Dr. Hunt wrote that, due to her problems, Plaintiff is unable to work. (Id.) Specifically, she cannot sit or stand for longer than ten minutes, cannot lift anything heavier than ten pounds, and cannot do repetitive bending, twisting, or lifting. (Id.)

_____

[5]A GAF score between 51 and 60 indicates "[m]oderate symptoms (e.g., flat affect and circumstantial speech, occasional panic attacks) OR moderate difficulty in social, occupational, or school functioning (e.g., few friends, conflicts with peers or co-workers)." DSM-IV-TR at 34 (emphasis omitted).

In May 2010, a Psychiatric Review Technique form was completed by Aine Kresheck, Ph.D. (Id. at 314-25.) Plaintiff was reported to have an affective disorder, specifically, a depressive disorder evidenced by anhedonia, sleep disturbance, decreased energy, and difficulty thinking or concentrating. (Id. at 314, 316.) This disorder resulted in mild restrictions in activities of daily living, mild difficulties in maintaining social functioning, and moderate difficulties in maintaining concentration, persistence, or pace. (Id. at 322.) It did not result in any repeated episodes of decompensation of extended duration. (Id.)

On a Mental Residual Functional Capacity Assessment form, Dr. Kresheck rated Plaintiff as being moderately limited in one of the three abilities in the area of understanding and memory, i.e., understanding and remembering detailed instructions, and not significantly limited in the other two. (Id. at 35.) In the area of sustained concentration and persistence, Plaintiff was moderately limited in two of the eight listed abilities, i.e., the ability to carry out detailed instructions and the ability to maintain attention and concentration for extended periods, and was not significantly limited in the other six. (Id. at 35-36.) She was not significantly limited in any of the five listed abilities in the area of social interaction. (Id. at 36.) Plaintiff was moderately limited in one of the four abilities in the area of adaptation, i.e., her ability to respond appropriately to changes in the work setting, and was not significantly limited in the other three abilities. (Id.)

The same month, a Physical Residual Functional Capacity Assessment (PRFCA) of Plaintiff was completed by Suzanne Page, single decision maker.[6]  (Id. at 326-31.)  Plaintiff had exertional limitations of being able to occasionally lift or carry twenty pounds, frequently lift and carry ten pounds, and stand, walk, or sit about six hours in an eight-hour workday.  (Id. at 327.)  Her ability to push and/or pull was otherwise limited.  (Id.)  She had postural limitations of only occasionally stooping, kneeling, crouching, crawling, and climbing ramps and stairs.  (Id. at 328.)  She should never climb ladders, ropes, and scaffolds.  (Id.)  She had no manipulative, visual, communicative, or environmental limitations.  (Id. at 328-29.)

## The ALJ's Decision

The ALJ first determined that Plaintiff met the insured status of the Act through June 30, 2009, and has not continuously engaged in substantial gainful activity since her alleged onset date of April 1, 2003.  (Id. at 45.)  The ALJ next found that Plaintiff has severe impairments of degenerative disc disease of the lumbar spine, obesity, and depression.  (Id. at 46.)  She did not, however, have an impairment that met or medically equaled an impairment of listing-level severity.  (Id.)

Specifically addressing Plaintiff's mental impairment, the ALJ found that the impairment resulted in mild restrictions in activities of daily living, mild difficulties in social

---

[6]See 20 C.F.R. §§ 404.906, 416.1406 (defining role of single decision-maker under proposed modifications to disability determination procedures).  See also **Shackleford v. Astrue**, 2012 WL 918864, *3 n.3 (E.D. Mo. Mar. 19, 2012) ("Single decision-makers are disability examiners authorized to adjudicate cases without mandatory concurrence by a physician.") (citation omitted).

functioning, and moderate difficulties with regard to concentration, persistence, or pace. (Id. at 47.) She had not had any episodes of decompensation of extended duration. (Id.)

The ALJ next found that Plaintiff has the residual functional capacity (RFC) to perform light work with an additional restriction that, because of her mental impairment, it be limited to unskilled jobs. (Id.) When assessing Plaintiff's RFC, the ALJ evaluated her credibility, and found it lacking. (Id. at 48-49.) Weighing against Plaintiff's credibility were the apparent inconsistency between her complaints of disabling disc herniation, depression, and right arm injury and the paucity of medical care for such, e.g., the lack of complaints of back pain from September 2010 to February 2011, "suggest[ing] that the herniation may have resolved or never existed"; the inconsistency between her testimony that she "relie[d] upon her husband to help her with 'everything'" and her testimony that, as a truck driver, he was gone for days at a time; and the inconsistency between her alleged onset date of 2003 and her continuing to work after then. (Id.) Also detracting from her credibility were (a) the improvement in her psychological symptoms when she was taking her medications and her failure to consistently do so, (b) her GAF scores, and (c) the lack of any statement by a doctor treating her mental illness that she is unable to work or should not work. (Id. at 49.)

The ALJ concluded that with her RFC, Plaintiff could return to her past relevant work as a dishwasher, housekeeper, sanitation worker/cleaner/ and factory worker. (Id. at 50-51.) She was not, therefore, disabled within the meaning of the Act. (Id. at 51.)

## Additional Records Before the Appeals Council

With her request that the Appeals Council review the ALJ's adverse decision, Plaintiff

submitted additional information from Dr. Asher.

In August 2011, Dr. Asher wrote:

> [Plaintiff] had told me in March and June that she was doing OK. I learned
> today that she was suffering from much depression and anxiety at that time but
> held back because of her (unsubstantiated) fears that I would commit her
> involuntarily if I knew how poorly she was functioning. Today I learned that
> [Plaintiff] is having daily panic attacks and that she cannot tolerate being
> around more than two other people. . . . I am aware that she is entirely unable
> to attend group therapy because her anxiety about being in a group paralyzed
> her. I emphasized that individual therapy that focuses on the here and would
> be the strategy that I recommend. . . . She has terrifying nightmares according
> to her husband. This is all consistent with [PTSD]. Now that I am aware of
> her worsening, I am increasing her medications and I plan to see her more
> often.

(Id. at 375.)

In June 2012, Dr. Asher completed a Mental Residual Functional Capacity

Assessment Form. (Id. at 384-88.) In eight activities listed for the area of daily living, Dr.

Asher rated Plaintiff as being markedly limited in her abilities to cope with stress; behave in

an emotionally stable manner; relate in societal situations; and be reliable. (Id. at 384.) She

was moderately limited in her ability to care for herself and slightly limited in her abilities

to dress herself and meet personal needs; to function independently; and to maintain her

personal appearance. (Id.) In the area of social functioning, he assessed Plaintiff as being

markedly limited in the five of the six abilities he rated and slightly limited in the remaining

one: her ability to maintain socially acceptable behavior and to adhere to basic standards of

cleanliness.  (Id. at 385.)  In the area of concentration, understanding, and memory, he assessed Plaintiff as being markedly limited in ten of the eleven abilities listed and moderately limited in one: the ability to understand and remember short and simple instructions.  (Id. at 386-87.)  And, she had continual episodes of deterioration.  (Id. at 387.)

## Standards of Review

Under the Act, the Commissioner shall find a person disabled if the claimant is "unable to engage in any substantial activity by reason of any medically determinable physical or mental impairment," which must last for a continuous period of at least twelve months or be expected to result in death.  42 U.S.C. §§ 423(d)(1), 1382c(a)(3)(A).  Not only the impairment, but the inability to work caused by the impairment must last, or be expected to last, not less than twelve months.  **Barnhart v. Walton**, 535 U.S. 212, 217-18 (2002). Additionally, the impairment suffered must be "of such severity that [the claimant] is not only unable to do [her] previous work, but cannot, considering [her] age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy, regardless of whether . . . a specific job vacancy exists for [her], or whether [s]he would be hired if [s]he applied for work."  42 U.S.C. §§ 423(d)(2)(A), 1382c(a)(3)(B).

"The Commissioner has established a five-step 'sequential evaluation process' for determining whether an individual is disabled.'"  **Phillips v. Colvin**, 721 F.3d 623, 625 (8th Cir. 2013) (quoting Cuthrell v. Astrue, 702 F.3d 1114, 1116 (8th Cir. 2013) (citing 20 C.F.R.

§§ 404.1520(a) and 416.920(a)). "Each step in the disability determination entails a separate analysis and legal standard." **Lacroix v. Barnhart**, 465 F.3d 881, 888 n.3 (8th Cir. 2006). First, the claimant cannot be presently engaged in "substantial gainful activity." <u>See</u> 20 C.F.R. §§ 404.1520(b), 416.920(b); **Hurd v. Astrue**, 621 F.3d 734, 738 (8th Cir. 2010). Second, the claimant must have a severe impairment. <u>See</u> 20 C.F.R. §§ 404.1520(c), 416.920(c). A"severe impairment" is "any impairment or combination of impairments which significantly limits [claimant's] physical or mental ability to do basic work activities . . . ." <u>Id.</u>

At the third step in the sequential evaluation process, the ALJ must determine whether the claimant has a severe impairment which meets or equals one of the impairments listed in the regulations and whether such impairment meets the twelve-month durational requirement. <u>See</u> 20 C.F.R. §§ 404.1520(d), 416.920(d) and Part 404, Subpart P, Appendix 1. If the claimant meets these requirements, she is presumed to be disabled and is entitled to benefits. **Bowen v. City of New York**, 476 U.S. 467, 471 (1986); **Warren v. Shalala**, 29 F.3d 1287, 1290 (8th Cir. 1994).

"Prior to step four, the ALJ must assess the claimant's [RFC], which is the most a claimant can do despite her limitations." **Moore v. Astrue**, 572 F.3d 520, 523 (8th Cir. 2009). "[A]n RFC determination must be based on a claimant's ability 'to perform the requisite physical acts day in and day out, in the sometimes competitive and stressful conditions in which real people work in the real world.'" **McCoy v. Astrue**, 648 F.3d 605,

617 (8th Cir. 2011) (quoting <u>Coleman v. Astrue</u>, 498 F.3d 767, 770 (8th Cir. 2007)).

Moreover, "'a claimant's RFC [is] based on all relevant evidence, including the medical records, observations of treating physicians and others, and an individual's own description of his limitations.'" **Moore**, 572 F.3d at 523 (quoting <u>Lacroix</u>, 465 F.3d at 887); <u>accord</u> **Partee v. Astrue**, 638 F.3d 860, 865 (8th Cir. 2011).

"'Before determining a claimant's RFC, the ALJ first must evaluate the claimant's credibility.'" **Wagner v. Astrue**, 499 F.3d 842, 851 (8th Cir. 2007) (quoting <u>Pearsall v. Massanari</u>, 274 F.3d 1211, 1217 (8th Cir. 2002)). This evaluation requires the ALJ consider "'[1] the claimant's daily activities; [2] the duration, frequency and intensity of the pain; [3] precipitating and aggravating factors; [4] dosage, effectiveness and side effects of medication; [5] functional restrictions.'" **Id.** (quoting <u>Polaski v. Heckler</u>, 739 F.2d 1320, 1322 (8th Cir. 1984)). "The credibility of a claimant's subjective testimony is primarily for the ALJ to decide, not the courts.'" **Id.** (quoting <u>Pearsall</u>, 274 F.3d at 1218). After considering the <u>Polaski</u> factors, the ALJ must make express credibility determinations and set forth the inconsistencies in the record which caused the ALJ to reject the claimant's complaints. **Ford v. Astrue**, 518 F.3d 979, 982 (8th Cir. 2008); **Singh v. Apfel**, 222 F.3d 448, 452 (8th Cir. 2000).

At step four, the ALJ determines whether claimant can return to her past relevant work, "review[ing] [the claimant's] [RFC] and the physical and mental demands of the work [claimant has] done in the past." 20 C.F.R. §§ 404.1520(e), 416.920(e). The burden at step

four remains with the claimant to prove her RFC and establish she cannot return to her past relevant work. **Moore**, 572 F.3d at 523; accord **Dukes v. Barnhart**, 436 F.3d 923, 928 (8th Cir. 2006); **Vandenboom v. Barnhart**, 421 F.3d 745, 750 (8th Cir. 2005).

If the ALJ holds at step four of the process that a claimant cannot return to past relevant work, the burden shifts at step five to the Commissioner to establish the claimant maintains the RFC to perform a significant number of jobs within the national economy. **Pate-Fires v. Astrue**, 564 F.3d 935, 942 (8th Cir. 2009); **Banks v. Massanari**, 258 F.3d 820, 824 (8th Cir. 2001).

If the claimant is prevented by her impairment from doing any other work, the ALJ will find the claimant to be disabled.

The ALJ's decision whether a person is disabled under the standards set forth above is conclusive upon this Court "'if it is supported by substantial evidence on the record as a whole.'" **Wiese v. Astrue**, 552 F.3d 728, 730 (8th Cir. 2009) (quoting Finch v. Astrue, 547 F.3d 933, 935 (8th Cir. 2008)); accord **Dunahoo v. Apfel**, 241 F.3d 1033, 1037 (8th Cir. 2001). "'Substantial evidence is relevant evidence that a reasonable mind would accept as adequate to support the Commissioner's conclusion.'" **Partee**, 638 F.3d at 863 (quoting Goff v. Barnhart, 421 F.3d 785, 789 (8th Cir. 2005)). When reviewing the record to determine whether the Commissioner's decision is supported by substantial evidence, however, the Court must consider evidence that supports the decision and evidence that fairly detracts from that decision. **Moore**, 623 F.3d at 602; **Jones**, 619 F.3d at 968; **Finch**, 547 F.3d at 935. The

Court may not reverse that decision merely because substantial evidence would also support an opposite conclusion, **Dunahoo**, 241 F.3d at 1037, or it might have "come to a different conclusion," **Wiese**, 552 F.3d at 730. "'If after reviewing the record, the [C]ourt finds it is possible to draw two inconsistent positions from the evidence and one of those positions represents the ALJ's findings, the [C]ourt must affirm the ALJ's decision.'" **Partee**, 638 F.3d at 863 (quoting <u>Goff</u>, 421 F.3d at 789).

### Discussion

Plaintiff argues, inter alia, that the ALJ erred by not giving the proper amount of weight to Dr. Asher's opinion. The Court agrees.

Dr. Asher is Plaintiff's treating psychiatrist. Dr. Zakroff is her treating physician, and specializes in family medicine. Dr. Asher diagnosed Plaintiff with PTSD; Dr. Zakroff diagnosed her with depression. Symptoms of PTSD include "markedly diminished interest or participation in significant activities"; "feeling of detachment or estrangement from others"; "difficulty falling or staying asleep"; "irritability or outbursts of anger"; "difficulty concentrating"; and "hypervigilance." <u>DSM-IV-TR</u> at 468. The ALJ found Plaintiff has a severe impairment of depression. "'Greater weight is generally given to the opinion of a specialist about medical issues in the area of speciality, than to the opinion of a non-specialist.'" **Brown v. Astrue**, 611 F.3d 941, 953 (8th Cir. 2010) (quoting <u>Thomas v. Barnhart</u>, 130 Fed.Appx. 62, 64 (8th Cir. 2005)). Evidence submitted to the Appeals Council by Dr. Asher relative to Plaintiff's PTSD contradicts two essential findings of the ALJ: (1)

that Plaintiff's mental impairment improved with treatment and (2) that no doctor has rendered an opinion suggesting she is disabled. Although new evidence submitted to the Appeals Council is considered only to the extent it "relates to the period on or before the date of the [ALJ's] hearing decision." 20 C.F.R. §§ 404.970(b), 416.1470(b), when that decision is challenged in a § 405(g) action, the Court determines whether it is "supported by substantial evidence on the record as a whole, including the new evidence," **Davidson v. Astrue**, 501 F.3d 987, 990 (8th Cir. 2007). Given the new evidence of Dr. Asher's, the ALJ's decision lacks substantial evidence on the record as a whole. The case shall be remanded for further consideration of that evidence and, if necessary, a consultative psychological evaluation.

On remand, the credibility of Plaintiff should also be reassessed. The ALJ found her credibility lacking; however, the grounds for this conclusion are not supported by substantial evidence on the record as a whole. First, noting that the husband is gone for days at a time, the ALJ discounted her and her husband's report that he helped her with personal and housekeeping chores. The ALJ did not consider the evidence in the record that her children help her also. The ALJ cited a failure of Plaintiff to comply with her doctor's treatment plan. The record cited simply reads, "No medication noncompliance," suggesting the opposite. The ALJ also cited Plaintiff's refusal to attend group therapy; however, that refusal was explained by Dr. Asher.

When reassessing Plaintiff's credibility on remand, the question of whether a Bosnian interpreter is needed should also be reconsidered. See **Nguyen v. Apfel**, 51 Fed.Appx. 760, 761 (9th Cir. 2002) (remanding case for ALJ to obtain assistance of translator when reevaluating claimant's testimony). The ALJ found that one was not necessary, noting that Plaintiff was referred to in two records as being fluent in English. A reading of the hearing transcript contradicts that finding. Moreover, when Dr. Zakroff noted that Plaintiff spoke fluent English, she also noted in that same record that Plaintiff sometimes forgot how to speak or understand English. Another physician in the same practice, Dr. Hendricks, noted when referring Plaintiff to an orthopedist nineteen months later that Plaintiff needed a Bosnian interpreter. When being treated by Dr. Asher thirteen months after the referral, Plaintiff's speech was translated. She had a translator present again the next month, December 2010, and the month after, January 2011. Two months later, Plaintiff reported she did not need a translator because "when her depression is better her memory is better." (R. at 371.) She did not, as summarized by the ALJ at the hearing, state that she no longer needed a translator because her memory was "just fine now that she's on medication." (R. at 13.)

## Conclusion

For the foregoing reasons, the case shall be remanded for a reevaluation of Plaintiff's PTSD and her credibility. Although the Court is aware that upon remand, the ALJ's decision as to non-disability may not change after properly considering all evidence of record and

undergoing the required analysis, see **Pfitzer v. Apfel**, 169 F.3d 566, 569 (8th Cir. 1999), the

determination is nevertheless one that the Commissioner must make in the first instance.

Therefore,

**IT IS HEREBY ORDERED** that the decision of the Commissioner is REVERSED

and this case is REMANDED for further proceedings as discussed above.

An appropriate Order of Remand shall accompany this Memorandum and Order.


/s/ Thomas C. Mummert, III
THOMAS C. MUMMERT, III
UNITED STATES MAGISTRATE JUDGE

Dated this  24th  day of March, 2014.